1  **BRADLEY/GROMBACHER, LLP**
   Marcus Bradley, Esq. (SBN 174156)
2  Kiley Grombacher, Esq. (SBN 245960)
   Lisa Johnston Nicholes, Esq. (SBN 242852)
3  31365 Oak Crest Drive, Suite 240
   Westlake Village, CA  91361
4  Telephone: (805) 270-7100
   Facsimile: (805) 618-2939
5  E-mail: mbradley@bradleygrombacher.com
6          kgrombacher@bradleygrombacher.com
           ljnicholes@bradleygrombacher.com
7

8  *Attorneys for Plaintiff and others similarly situated*

9                **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11

12  GEORGE TERON, individually and on behalf     **CASE NO.  5:24-cv-1918**
    of all others similarly situated,
13                                               <u>**CLASS ACTION**</u> **COMPLAINT FOR:**

14                                               1.  **VIOLATION OF STATE**
                        Plaintiff,                   **CONSUMER FRAUD ACTS;**
15
    v.                                           2.  **UNJUST ENRICHMENT/QUASI**
16                                                   **CONTRACT;**

17                                               3.  **UNFAIR COMPETITION IN**
                                                     **VIOLATION OF BUSINESS AND**
18  ALCHEMEE, LLC and                                **PROFESSIONS CODE §17200,** *et*
    TARO PHARMACEUTICALS U.S.A., INC.,               *seq.;*
19
                        Defendants.              4.  **FALSE AND MISLEADING**
20                                                   **ADVERTISING IN VIOLATION OF**
                                                     **BUSINESS AND PROFESSIONS**
21                                                   **CODE §17500,** *et seq.;* **AND,**

22                                               5.  **VIOLATION OF CALIFORNIA**
                                                     **CIVIL CODE § 1750,** *et seq.*
23

24                                               **DEMAND FOR JURY TRIAL**

25

26

27

28

                                    -1-
                        **CLASS ACTION COMPLAINT**

Plaintiff, Mr. George Teron ("Plaintiff"), individually, on behalf of himself and on behalf of all others similarly situated, by and through his attorneys, brings this class action complaint against Defendants, Alchemee, LLC ("Alchemee") and Taro Pharmaceuticals U.S.A., Inc. ("Taro") (together, "Defendants"), and alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      This is a class action lawsuit regarding Defendants' manufacturing, distribution, advertising, marketing, and sale of Proactiv branded benzoyl peroxide ("BPO") acne treatment products (the "BPO Products"[1]) that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.      The presence of benzene in the BPO Products renders them adulterated, misbranded, and illegal to sell under federal and state law.

3.      Prior to placing the BPO Products into the stream of commerce and into the hands of consumers to use on their skin, Defendants knew or should have known that the BPO Products contained benzene, but  misrepresented, omitted, and concealed this fact to consumers, including Plaintiff and Class members, by not including benzene on the BPO Products' labels or otherwise warning about its presence.

4.      Plaintiff and Class members reasonably relied on Defendants' representations that the BPO Products were safe, unadulterated, and free of any carcinogens that are not listed on the label.

5.      Plaintiff and Class members purchased the BPO Products, which contain harmful levels of benzene, at premium name brand prices. Plaintiff and Class members would not have purchased the BPO Products at all, or would have paid much less for the BPO Products, had they known the BPO Products contain harmful levels of benzene. Alternatively, Plaintiff and Class members would have purchased different over-the-counter acne treatment products at significantly lower prices (see price comparison table included herein) had they known the truth

---

[1] The BPO Products refers to Proactiv Solution Renewing Cleanser, Proactiv Solution Repairing Treatment, Proactiv+ Skin Smoothing Exfoliator, Proactiv+ Pore Targeting Treatment, and Proactiv Emergency Blemish Relief.

that the premium-priced BPO Products were and are adulterated with benzene.

6.      The BPO Products are worthless because they contain benzene, a known human carcinogen that is an avoidable ingredient in the BPO Products' manufacturing process. Indeed, the presence of benzene renders the BPO Products adulterated, misbranded, and illegal to sell.

7.      Defendants are therefore liable to Plaintiff and Class members for misrepresenting and/or failing to disclose or warn that the BPO Products contain benzene or degrade and form benzene over a short period of time.

## PARTIES

8.      Plaintiff is a resident and citizen of Milpitas, California. Plaintiff has purchased each of the Defendants' BPO Products over a period of approximately twenty-seven years (1997-2024). The last time Plaintiff purchased one of the BPO Products for personal or household use was in approximately November 2023. Plaintiff has purchased the BPO Products from Proactiv.com, Amazon.com, and various other online retailers.

9.      When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations by Defendants that the BPO Products were properly manufactured, free from defects, and safe for their intended use. Plaintiff relied on these representations when deciding to purchase the BPO Products at elevated name brand prices, and these representations were part of the basis of the bargain. Had Defendants not made the false, misleading, and deceptive representations and omissions regarding the BPO Products containing benzene or that the BPO Products would degrade into benzene in a short period of time under reasonable conditions, Plaintiff would not have purchased the BPO Products, would have paid less for them, or would have purchased alternative over-the-counter acne treatment products for a much lower price. The BPO Products Plaintiff purchased were worthless because they contained the known carcinogen benzene. Accordingly, Plaintiff was injured in fact at the point of purchase and lost money as a result of Defendants' improper conduct.

10.      Alchemee is a limited liability company organized, existing, and doing business under and by virtue of the laws of the state of Delaware with its principal place of business in Hawthorne, New York. Alchemee is a subsidiary of Taro.

**CLASS ACTION COMPLAINT**

11.     Taro is a corporation organized, existing, and doing business under and by virtue of the laws of the state of New York with its principal place of business in Hawthorne, New York. Taro is the parent company of Alchemee.

12.     Defendants market, sell, and distribute Proactiv branded acne treatment products, including the BPO Products at issue, in California and throughout the United States. The BPO Products, including those purchased by Plaintiff and Class members, are available for sale on Defendants' website, www.Proactiv.com, on www.Amazon.com, and are sold by various retailers, including Target, Ulta Beauty, and CVS Pharmacy, both online and in their brick-and-mortar stores throughout the United States. Defendants authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the BPO Products.

**JURISDICTION AND VENUE**

13.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

14.     This Court has personal jurisdiction over Defendants because the claims asserted in this complaint arise out of Defendants' contacts with this District. Defendants have been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state, and/or marketed, advertised, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and putative Class members, which arose out of the acts and omissions that occurred in the state of California, during the relevant time period, at which time Defendants were engaged in business activities in the state of California.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a

1   substantial part of the events or omissions giving rise to the claims asserted in this complaint

2   occurred in this state. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants

3   conduct substantial business in this District, has sufficient minimum contacts with this District,

4   and otherwise purposely avails itself of the markets in this District, through the promotion, sale,

5   and marketing of the BPO Products in this District.

6       16.    Venue is also proper in this District because Plaintiff George Teron and many

7   Class Members reside in the Northern District of California and throughout the state of California.

8   <div align="center">**FACTUAL ALLEGATIONS**</div>

9   **I.    Defendants' History in the Industry**

10      17.    Proactiv has "over 25 years of skincare innovation and more than 20 million

11  customers worldwide" and purports to be "America's #1 acne routine."[2]

12      18.    In 2010, Proactiv introduced a new micro-crystal benzoyl peroxide formula "for

13  faster and gentle results."[3]

14      19.    Indeed, benzoyl peroxide is an active ingredient in all the BPO Products.

15      20.    The BPO Products are name brand premium-priced products that are significantly

16  more expensive per product[4] than other over-the-counter acne treatment products which do not

17  contain benzoyl peroxide (see table below).

18  **II.    Evidence of Benzene's Danger**

19      21.    Benzene is used primarily as a solvent in the chemical and pharmaceutical

20  industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in

21  gasoline. The major United States source of benzene is petroleum. The health hazards of benzene

22  have been recognized for over one hundred years.

23      22.    "Human exposure to benzene has been associated with a range of acute and long-

24  term adverse health effects and diseases, including cancer and haematological effects."[5]

25

26  [2] https://www.proactiv.com/about-us.
    3 https://www.proactiv.com/proactiv-history.

27  [4] The BPO Products are typically at *least* $10—and often even much more—expensive than other
    over-the-counter acne treatment products. https://www.healthline.com/health/skin/does-proactiv-

28  work.
    [5] https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2.

<div align="center">**CLASS ACTION COMPLAINT**</div>

23.    A toxicity assessment by the Centers for Disease Control and Prevention has shown benzene can harm the central nervous system and may affect reproductive organs.[6]

24.    According to the World Health Organization, "Benzene is a genotoxic carcinogen in humans and no safe level of exposure can be recommended."[7]

25.    According to the National Cancer Institute, "[e]xposure to benzene increases the risk of developing leukemia and other blood disorders."[8]

26.    According to the National Toxicology Program, benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[9]

27.    Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC"). Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[10] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on sufficient evidence of carcinogenicity in humans, sufficient evidence of carcinogenicity in experimental animals, and strong mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[11]

28.    The U.S. Food and Drug Administration ("FDA") also recognizes that "[b]enzene is a carcinogen that can cause cancer in humans"[12] and classifies benzene as a "Class 1" solvent that should be "avoided" in drug manufacturing.[13] FDA guidance provides: "Solvents in Class 1 [e.g. benzene] should not be employed in the manufacture of drug substances, excipients, and

---

[6] https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf.
[7] WHO Guidelines for Indoor Air Quality: Selected Pollutants (2010).
[8] https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.
[9] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis in original).
[10] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.
[11] *Id*. at 34.
[12] https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages#q1.
[13] https://www.fda.gov/media/71737/download.

1    drug products because of [its] unacceptable toxicity."[14]

2        29.    "Even in trace amounts, benzene is known to pose a health risk from exposure

3    routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[15]

4        30.    In July 2021, the FDA conducted a "Health Hazard Evaluation" on "Multiple

5    Aerosol Sunscreen Products" manufactured by Johnson & Johnson.[16] The evaluation was

6    requested following testing which showed benzene levels ranging "from 11.2 to 23.6 ppm" in

7    Johnson & Johnson's aerosol sunscreen products. Specifically, the agency requested "an

8    evaluation of the likelihood and risks associated with using aerosol sunscreens that contain

9    benzene 11.2 to 23.6 ppm," which "levels exceed the guideline value provided by ICH [Q3C][17]

10    and USP[18]" limits, states the report. The FDA report concluded that serious adverse effects,

11    including potential for "life-threatening" issues or "permanent impairment of a body function"

12    were "likely to occur" at exposure levels within that range. In addition, the report stated that

13    "individuals with altered skin absorption (i.e., infants, elderly, broken skin) and individuals who

14    are exposed to benzene from other sources (e.g. smokers or occupational/environmental

15    exposure) may be at greater risk."

16        31.    On December 27, 2023, in response to reports of benzene contamination in various

17    drug products, the FDA issued an "Alert," advising manufacturers that "If any drug products

18    batches with benzene above 2 ppm are already in distribution, the manufacturer should contact

19    FDA to discuss the voluntary initiation of a recall…."[19]

20        32.    Human skin is a living organism. Direct benzene exposure through the skin is

21

22    ───────────────

23    [14] *Id.*

[15] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.

24    [16] https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

25    [17] The term "ICH" refers to The International Conference on Harmonization (ICH) Q3C

26    Impurities:    Residual    Solvents    guidance    (December    1997),    at https://www.fda.gov/media/71736/download?attachment.

27    [18] The term "USP" refers to United States Pharmacopeia (USP) Residual Solvents, at https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf.

28    [19]    https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.

**CLASS ACTION COMPLAINT**

1   particularly concerning, because "[d]irect exposure of the eyes, skin, or lungs to benzene can

2   cause tissue injury and irritation."[20]  Accordingly, The National Institute for Occupational Safety

3   and Health ("NIOSH") recommends protective equipment be worn by workers exposed or

4   expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin

5   absorption, ingestion, skin and/or eye contact" as exposure routes or paths.[21]

6       33.     Therefore, as with other topically applied products, such as sunscreen, the

7   application of chemically-laden acne products specifically increases the absorption rate of

8   benzene through the skin, thereby increasing the risk of harm.[22] Individuals with acne are

9   particularly vulnerable to harm from dangerous chemicals, like benzene, because they have a

10   damaged skin barrier.[23]

11   **III.**       **Discovery of Benzene in the BPO Products**

12       34.     Due to the substantial harm to humans caused by exposure to chemicals such as

13   benzene, companies have been founded with the specific goal of preventing defective products

14   containing said harmful chemicals from reaching consumers. Valisure "is a pioneering technology

15   company at the forefront of addressing a critical gap in the healthcare supply chain through

16   independent quality assurance.[24] Its mission is "to help ensure the safety, quality, and consistency

17   of medications and supplements in the market."[25]

18       35.     In terms of accreditation and registration, "Valisure operates an analytical

19

20 [20] Facts About Benzene, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

21 [21] NIOSH Pocket Guide to Chemical Hazards - Benzene, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH),

22 https://www.cdc.gov/niosh/npg/npgd0049.html.
[22] *Valisure Detects Benzene in Sunscreen*, VALISURE BLOG (May 25, 2021),

23 https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/.
[23] A person's skin barrier works to keep water in and to keep chemicals out. A person with acne

24 has a damaged skin barrier and is highly susceptible to the harm that results from exposure to benzene via the ordinary and intended use of the BPO Products.

25 https://health.clevelandclinic.org/skin-barrier.
[24] https://www.valisure.com/about.

26 [25] *Valisure Citizen Petition on Benzene in Benzoyl Peroxide Drug Products* (March 5, 2024),

27 chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://assets-global.website-files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20P

28 etition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf ("*Valisure Citizen Petition*") at 5.

1    laboratory that is accredited under International Organization for Standardization ('ISO/IEC')

2    17025:2017 standards for chemical testing (PJLA Accreditation Number 94238)," and it "is

3    registered with the Drug Enforcement Administration (License # RV0484814)."[26]

4        36.    Valisure has tested for specific chemical qualities in numerous types of products,

5    such as N-Nitrosodimethylamine in ranitidine and metformin and benzene in hand sanitizers and

6    sun care products. Each time, Valisure's detection of benzene and other carcinogens has been

7    independently confirmed by the industry and led to recalls by manufacturers over the subject

8    products.

9        37.    On March 5, 2024, Valisure reported its testing results for benzene in various types

10    of BPO drug products, mostly utilizing gas chromatography and detection by mass spectrometry

11    ("GC-MS") instrumentation that allows mass spectral separation and utilizing selected ion

12    chromatograms, along with Selected Ion Flow Tube-Mass Spectrometry ("SIFT-MS") for

13    detection of benzene released into the air around certain BPO products. Valisure also used other

14    orthogonal approaches for confirmation of a few select products.[27]

15        38.    GC-MS "is generally considered one of the most accurate analyses available."[28]

16    Indeed, the FDA used the same method to test for impurities like benzene in hand sanitizers.[29]

17        39.    "The GC-MS method described in [Valisure's] petition utilized body temperature

18    (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid

19    pharmaceuticals and beverages, and reduced false positive results compared with higher-

20    temperature incubation."[30]

21        40.    Valisure analyzed 66 different BPO containing drug products incubated at 50°C[31]

22

23    [26] Id.

    [27] Id. at 10.

24    [28] GC/MS Analysis, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories.

25    [29] Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection

26    of Listed Impurities in Hand Sanitizers, FDA (Aug. 24, 2020), https://www.fda.gov/media/141501/download.

27    [30] Valisure Citizen Petition at 10-11 (citations omitted).

28    [31] "50°C (122°F) is not only a reasonable temperature that 'the product may be exposed to during distribution and handling by consumers' but is an accepted incubation temperature used by the pharmaceutical industry for performing accelerated stability studies with a duration of at least 3

**CLASS ACTION COMPLAINT**

for 18 days, including 4 of Defendants' BPO Products, for the presence of benzene.[32]

41.    Every one of the BPO Products tested contained high levels of benzene, ranging from:

a.    Almost 400 ppm after 4 days, and nearly 1800 ppm after 14 days, for Proactiv Solution Renewing Cleanser;

b.    Almost 400 ppm after 10 days, and 600 ppm after 18 days, for Proactiv Emergency Blemish Relief;

c.    Over 50 ppm after 4 days, and almost 250 ppm after 14 days, for Proactiv+ Skin Smoothing Exfoliator; and

d.    20 ppm after 10 days, and over 40 ppm after 18 days, for Proactiv+ Pore Targeting Treatment.[33]

42.    "The current data on BPO degrading into high levels of benzene is extremely concerning given its prominent use in skin care, and this study should serve as another wake-up call for improved manufacturing and quality control of consumer healthcare products."[34]

43.    The BPO Products are not designed to contain benzene, and no amount of benzene is acceptable in acne treatment products such as the BPO Products manufactured, distributed, and sold by Defendants. People with acne are particularly vulnerable to the harmful effects of the dangerous chemical benzene because they have a damaged skin barrier.[35] Further, although Defendants list the ingredients on the BPO Products' labels, Defendants failed to disclose on the BPO Products' labeling or anywhere in Defendants' marketing that the BPO Product contains benzene.

44.    Despite its knowledge that the BPO Products contain benzene, Defendants have failed to issue a voluntary recall of the BPO Products.

_____

months." Id. at 18-19 (citations omitted).
[32] *Id.* at 15-16.
[33] *Id.*
[34] *Id.* at 29 (citing Email from Dr. Christopher Bunick, MD, PhD, Associate Professor of Dermatology at Yale University, New Haven, CT.).
[35] https://health.clevelandclinic.org/skin-barrier.

**CLASS ACTION COMPLAINT**

**IV.       Benzene Renders the BPO Product Adulterated, Misbranded, and Illegal to Sell**

45.    The BPO Products are "drugs" used to treat acne (i.e., *acne vulgaris*), formulated with a chemical called benzoyl peroxide, along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars. Before being sold to the public, the BPO Products must be made in conformity with current good manufacturing practices and must conform to quality, safety, and purity specifications.

46.    As drugs regulated by the FDA, the BPO Products are prohibited from being adulterated or misbranded.

47.    A drug is "adulterated" if it consists in whole or in part of any filthy, putrid, or decomposed substance, is impure, or mixed with another substance.[36]

48.    A drug is deemed misbranded if its labeling is false or misleading in any particular.[37]

49.    FDA guidance permits up to 2 ppm benzene in a product if its use in the manufacturing process is "unavoidable."[38]

50.    The FDA has announced recalls of various products contaminated with benzene, including certain hand sanitizers and sunscreens.[39]

51.    As set forth above, Defendants' BPO Products contain levels of benzene above 2 ppm.

52.    Defendants could have avoided any potential for benzene contamination in the BPO Products by changing the manufacturing process or raw ingredients, and the BPO Products could have been sold with absolutely no benzene in them. Specifically, BPO as a raw material is known to be thermally stable at purities as high as 75% up to temperatures of 98°C.[40] Valisure also evaluated pure BPO reference powder in its GC-MS analytical system and found no evidence

---

[36] *See* 21 U.S.C. § 351(a); *see also* § 351(b)-(d) (noting that a lack of purity or mixture with another substance also renders drug adulterated).
[37] *See* 21 U.S.C. § 352(a)(1).
[38] *Valisure Citizen Petition* at 6 (citing Food and Drug Administration, Q3C – *Tables and List Guidance for Industry* (2017) (https://www.fda.gov/media/71737/download)).
[39] *See Valisure Citizen Petition* at 7 (citations omitted).
[40] *Valisure Citizens Petition* at 25 (citation omitted).

**CLASS ACTION COMPLAINT**

of the instability and formation of benzene seen in formulated final products of BPO containing acne treatments.[41] Thus, if BPO is inherently stable as a pure, crystalline powder, a reformulated product that focuses on substantially reducing or entirely preventing the degradation of BPO into benzene could potentially be developed.[42]

53.     The mere presence of benzene renders the BPO Products both adulterated and misbranded under the Federal Food, Drug, and Cosmetic Act ("FDCA").

54.     A product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold.[43] Thus, adulterated and misbranded products like the BPO Products have no economic value and are legally worthless.

55.     If Defendants had disclosed to Plaintiff and putative Class members that the BPO Products contained or would degrade into benzene, and thus risked benzene exposure during use of the BPO Products, Plaintiff and putative Class members would not have purchased the BPO Products at premium prices, would have paid less for the BPO Products, or would have purchased different over-the-counter acne products at much lower price points than the BPO Products.

56.     As manufacturers, distributors, and sellers of acne treatment products, Defendants had and have a duty to ensure that their BPO Products did not and do not contain excessive (or any) level of benzene, including through regular testing, especially before injecting the BPO Products into the stream of commerce for consumers to use on their skin. But based on Valisure's testing results set forth above, Defendants made no reasonable effort to test its BPO Products for benzene. Nor did it disclose to Plaintiff in any advertising or marketing that its BPO Products contained or would degrade into benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA. To the contrary, Defendants represented the BPO Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

---

[41] *Id.*
[42] *See id.* at 25-26.
[43] *See* 21 U.S.C. § 331(a).

**V.    Defendants' Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiff and Reasonable Consumers**

57.    It is well known that BPO degrades to benzene when exposed to heat over time. This process was first reported in scientific literature as early as 1936.[44]

58.    The issue of BPO decomposition into benzene has been previously identified and acted upon in industries other than in the acne treatment product industry.

59.    For example, at least one patent application was filed by the chemical company Akzo Nobel N.V. in 1997 which "relates to a method for reducing the rate of free benzene and/or benzene derivative formation in BPO formulations based on organic plasticizers, such as pastes, emulsions, suspensions, dispersions and the like."[45]

60.    In the polymer manufacturing industry, BPO's decomposition into benzene has been studied and concern was raised specifically regarding the carcinogenic implications of the presence of benzene. In 1994, a paper was published[46] by researchers at Denmark's Department of Environmental Chemistry titled "Formation of benzene by hardeners containing benzoyl peroxide and phthalates" and stated:

> Recently, during the investigation of benzene residues in chemical products (Rastogi 1993a),[47] it was observed that the benzene content in benzoyl peroxide containing hardeners of two component repair-sets (fillers, elastomers) were >2 % (w/w) [20,000 ppm]. Benzene is carcinogenic (IARC 1982), and its use in consumer and industrial products is generally avoided.

61.    The study continues with heating of various BPO-containing products at 34°C, 50°C and 80°C finding substantial benzene formation at elevated temperatures, even exceeding

---

[44] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden,* HELU. CHIM. ACTA, 19, 338 (1936), https://onlinelibrary.wiley.com/doi/10.1002/hlca.19360190153.

[45] Borys F. SchafranBryce Milleville (1997). "Reduction of benzene formation in dibenzoyl peroxide formulations." Akzo Nobel N.V. Worldwide application, WO1997032845A1. (https://patents.google.com/patent/WO1997032845A1/en)

[46] Rastogi SC. Formation of benzene by hardeners containing benzoyl peroxide and phthalates. *Bull Environ Contam Toxicol*. 1994 Nov;53(5):747-52. doi: 10.1007/BF00196949. PMID: 7833612.

[47] Rastogi, S.C. Residues of benzene in chemical products. Bull. Environ. Contam. Toxicol. 50, 794-797 (1993). https://doi.org/10.1007/BF00209940.

1  levels found in this Petition. Furthermore, similar to Valisure's results, Rastogi finds that only

2  formulations of BPO are unstable, while BPO alone is relatively stable:

3      Even heating of BPO-phthalate mixtures at 50°C produced significant amounts of
        benzene (approximately 0.3% [3,000 ppm]), while no benzene production was
4       detected when benzoyl peroxide was heated alone at this temperature (Table 2).[48]

5      62.    The referenced 1993 Rastogi article above, titled "Residues of Benzene in

6  Chemical Products," has also been flagged by the US EPA as part of its Health & Environmental

7  Research Online ("HERO") system.[49]

8      63.    Chemical evidence of carcinogenicity has been reported since at least 1981.[50]

9  Multiple studies in the 1980s were conducted using animal models that suggested carcinogenic

10 potential of benzoyl peroxide, including the use of commercial drug formulations of BPO like

11 that of PanOxyl Gel.[51]

12     64.    In 1991, FDA posted an amendment to the monograph for OTC topical acne drug

13 products because, "the agency became aware of a 1981 study by Slage, et al. ([FDA] Ref. 1) that

14 raised a safety concern regarding benzoyl peroxide as a tumor promoter in mice and a 1984 study

15 by Kurokawa, et al. ([FDA] Ref. 2) that reported benzoyl peroxide to have tumor initiation

16 potential," leading FDA to determine that "further study is necessary to adequately assess the

17

18

[48] Id.
[49] US Environmental Protection Agency. Health & Environmental Research Online (HERO).
"Residues of Benzene in Chemical Products." HERO ID 2894703
(http://hero.epa.gov/hero/index.cfm/reference/details/reference__id/2894703).
[50] Slaga TJ, Klein-Szanto AJ, Triplett LL, Yotti LP, Trosko KE. Skin tumor-promoting activity
of benzoyl peroxide, a widely used free radical-generating compound. Science. 1981 Aug
28;213(4511):1023-5. doi: 10.1126/science.6791284. PMID: 6791284.
[51] Kurokawa Y, Takamura N, Matsushima Y, Imazawa T, Hayashi Y. *Studies on the promoting
and complete carcinogenic activities of some oxidizing chemicals in skin carcinogenesis.* Cancer
Lett. 1984 Oct;24(3):299-304. doi: 10.1016/0304-3835(84)90026-0. PMID: 6437666; Pelling JC,
Fischer SM, Neades R, Strawhecker J, Schweickert L. *Elevated expression and point mutation of
the Ha-ras proto-oncogene in mouse skin tumors promoted by benzoyl peroxide and other
promoting agents.* Carcinogenesis. 1987 Oct;8(10):1481-4. doi: 10.1093/carcin/8.10.1481.
PMID: 3115617; 81 O'Connell JF, Klein-Szanto AJ, DiGiovanni DM, Fries JW, Slaga TJ.
*Enhanced malignant progression of mouse skin tumors by the free-radical generator benzoyl
peroxide.* Cancer Res. 1986 Jun;46(6):2863-5. PMID: 3084079; 82 Iversen OH. *Carcinogenesis
studies with benzoyl peroxide (Panoxyl gel 5%).* J Invest Dermatol. 1986 Apr;86(4):442-8. doi:
10.1111/1523-1747.ep12285787. PMID: 3091706.

**CLASS ACTION COMPLAINT**

tumorigenic potential of benzoyl peroxide."[52]

65.    By 2010, FDA published a final monograph on benzoyl peroxide along with summarizing results from further studies on the potential carcinogenicity of benzoyl peroxide and actions of the FDA Advisory Committee. This final monograph stated, "The Committee recommended, by a four-to-three vote (with one abstention), that the known safety data regarding the tumor promoting potential of benzoyl peroxide should be communicated to consumers. Because this data was inconclusive, the Committee unanimously agreed that the word, ''cancer'' should not be included in the labeling of acne drug products containing benzoyl peroxide. The Committee was concerned that the word ''cancer'' would cause consumers to avoid using these products (even though the data were inconclusive)."[53]

66.    In 2020, the FDA started working with companies to identify benzene in products, which resulted in product recalls of hand sanitizers, sunscreens, and deodorants. In 2021, an independent chemical analysis by Valisure of hundreds of sunscreens and after-sun care products from 69 brands found 27 percent of the batches had significant levels of benzene above the FDA 2 ppm limit.[54]

67.    By 2021, Defendants were well aware of benzene contamination issues in its BPO Products and in products of their competitors.

68.    Further, Defendants, which market themselves as merchandisers of premium quality acne treatment products and employed high-level scientists, chemists, and researchers to formulate and/or decide which drug products to label and sell for public use, was aware of the well-known chemical processes that degrade their BPO Products into benzene when exposed to common used temperatures and conditions.

69.    *All* of Defendants' BPO Products are manufactured in the same manner.

70.    *All* lots of Defendants' BPO Products systematically degrade and form benzene

---

[52] Food and Drug Administration. *Proposed Rule: Reclassifies benzoyl peroxide from GRASE to Category III.* (August 7, 1991) Federal Register, 56FR37622. pp 37622 - 37635 (https://cdn.loc.gov/service/ll/fedreg/fr056/fr056152/fr056152.pdf#page=178).
[53] Food and Drug Administration. Final Monograph. (March 4, 2010) Federal Register, 75FR9767. (https://www.gpo.gov/fdsys/pkg/FR-2010-03-04/pdf/2010-4424.pdf).
[54] Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products, May 24, 2021.

**CLASS ACTION COMPLAINT**

over a short period of time.

71.     The rates of degradation and benzene impurities in the BPO products occur at a predictable and systematic rate, typically reaching their highest benzene concentration within 10 to 18 days.

72.     Defendants, large, sophisticated corporations in the business of manufacturing, distributing, and selling products containing BPO, knew or should have known the BPO Products were contaminated with excess levels of benzene and that testing the BPO Products for benzene was necessary to protect Plaintiff and putative class members from harmful levels of benzene exposure.

73.     Defendants' use of BPO put it on notice of the excessive levels of benzene in the BPO Products.

74.     Notwithstanding this knowledge, Defendants failed to appropriately and adequately test their BPO Products for the presence of benzene to protect Plaintiff and Class members from dangerous levels of benzene exposure.

75.     Defendants sold, and continue to sell, BPO Products during the class period despite Defendants' knowledge of the risk of benzene contamination.

76.     Benzene is not listed on the BPO Products' labels as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the BPO Products.

77.     Defendants have engaged in deceptive, untrue, and misleading advertising by making representations by failing to warn about the potential presence of benzene in the BPO Products, and nothing on the BPO Products' labels otherwise insinuate, state, or warn that the BPO Products contain or will degrade into benzene.

78.     The presence of benzene in the BPO Products renders the BPO Products misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce. Plaintiff would not have purchased the BPO Products, would have paid significantly less for the BPO Products, or would have purchased lower priced acne treatment products had the BPO Products been truthfully and accurately labeled.

79.     Had Defendants adequately tested their BPO Products for benzene and other

-16-
**CLASS ACTION COMPLAINT**

carcinogens and impurities, they would have discovered their BPO Products contained benzene – even at levels above the FDA's limit (to the extent even applicable), making the BPO Products illegal to distribute, market, and sell.

80.  Defendants also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."[55]

81.  Accordingly, Defendants knowingly, recklessly, or at least negligently, introduced a contaminated, adulterated, and misbranded BPO Products containing or that would degrade into dangerous amounts of benzene into the U.S. market.

82.  By marketing and selling its BPO Products in the stream of commerce with the intent that its BPO Products would be purchased by Plaintiff and Class members, Defendants warrants that the BPO Products are safe to use rather than adulterated acne treatment products containing a dangerous, cancer-causing chemical.

83.  Defendants did not disclose the actual or potential presence of benzene in its BPO Products on the BPO Products' labeling, advertising, marketing, or sale of the BPO Products.

84.  Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiff and Class members make purchasing decisions based on the representations made on the BPO Products' labeling, including the ingredients listed.

85.  Defendants know that if they had not omitted that the BPO Products contained or would degrade into benzene, then Plaintiff and Class members would not have purchased the BPO Products.

**VI.      Injuries to Plaintiff and Class Members**

86.  When Plaintiff purchased Defendants' BPO Products, Plaintiff did not know, and had no reason to know, that Defendants' BPO Products contained or would degrade into the harmful carcinogen benzene. Not only would Plaintiff not have purchased Defendants' BPO Products had he known the Products contained or would degrade into benzene, but he would also

---

[55] https://monographs.iarc.who.int/list-of-classifications.

**CLASS ACTION COMPLAINT**

not have been capable of purchasing them if Defendants had done as the law required and tested the BPO Products for benzene and other carcinogens and impurities.

87.     Absent Defendants' misrepresentations and wrongdoing, Plaintiff would have purchased alternative over-the-counter acne treatments that were not adulterated with benzene at much lower prices than the premium-priced BPO Products. The following tables illustrate the retail price premium at which Defendants sell the BPO Products on the Proactiv.com website compared to other acne treatment products for sale on Amazon.com which are *not* similarly adulterated with benzene.

| Product | Price per Ounce | Price savings per ounce compared to the BPO Products |
|---|---|---|
| ***Proactiv Solution Renewing Cleanser*** | $7.50 | |
| La Roche-Posay Effaclar Medicated Foaming Acne Face Wash with Salicylic Acid | $2.44 | **$5.06** |
| Cetaphil Acne Face Wash with Salicylic Acid | $2.07 | **$5.43** |

| Product | Price per Ounce | Price savings per ounce compared to the BPO Products |
|---|---|---|
| ***Proactiv Solution Repairing Treatment*** | $20.00 | |
| Neutralyze Renewal Complex Acne Moisturizer | $5.28 | **$14.72** |
| Clean & Clear Essentials Dual Action Oil-Free Facial Moisturizer, Salicylic Acid Acne Treatment with Pro-Vitamin B5 | $1.13 | **$18.87** |

| Product | Price per Ounce | Price savings per ounce compared to the BPO Products |
|---|---|---|
| ***Proactiv+ Skin Smoothing Exfoliator*** | $7.50 | |
| Differin Face Scrub Daily Brightening Exfoliator, Improves Tone and Texture for Acne Prone Skin | $1.76 | **$5.74** |
| Bioré Witch Hazel Pore | $1.01 | **$6.67** |

**CLASS ACTION COMPLAINT**

| Clarifying Acne Face Wash, Exfoliating Facial Cleanser | | |

| Product | Price per Ounce | Price savings per ounce compared to the BPO Products |
| --- | --- | --- |
| ***Proactiv+ Pore Targeting Treatment*** | $20.00 | |
| AcneFree Retinol Blemish Mark Resurfacing Serum with Hyaluronic Acid, Refines Pores | $7.49 | **$12.51** |
| Cos De BAHA Niacinamide 10% + Zinc PCA 1% Serum for Face - Pore Reducer | $6.50 | **$13.50** |

| Product | Price per Ounce | Price savings per ounce compared to the BPO Products |
| --- | --- | --- |
| ***Proactiv Emergency Blemish Relief*** | $66.00 | |
| Dermalogica Clear Start Breakout Clearing Booster Acne Spot Treatment with Salicylic Acid | $23.75 | **$42.25** |
| Bliss Clear Genius Acne Spot Treatment | $23.22 | **$42.78** |

88.    Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially prior to or at the point of sale, and therefore must rely on Defendants to truthfully and honestly report what the BPO Products contain on the BPO Products' packaging or labels.

89.    Further, given Defendants' position as a leader in the acne treatment market, Plaintiff and reasonable consumers trusted and relied on Defendants' representations and omissions regarding the presence of benzene in the BPO Products.

90.    Yet, when consumers look at the BPO Products' packaging, there is no mention of benzene. It is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the BPO Products. This leads reasonable consumers to believe the BPO Products do not contain benzene. Indeed, these expectations are reasonable

**CLASS ACTION COMPLAINT**

because if the BPO Products are manufactured and tested properly, benzene will not be present in the Products.

91.    No reasonable consumer would have paid any amount for products that contain or will degrade into benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA.

92.    Thus, if Plaintiff and Class members had been informed that Defendants' BPO Products contained or would degrade into benzene, they would not have purchased or used the BPO Products, making such omitted facts material to them.

93.    Defendants' false, misleading, omissions, and deceptive misrepresentations regarding the presence of benzene in the BPO Products are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiff and the Class members.

94.    Plaintiff and Class members bargained for products free of contaminants and dangerous substances. Plaintiff and Class members were injured by the full purchase price of the BPO Products at the point of sale because the BPO Products are worthless, as they are adulterated and contain harmful levels of benzene and Defendants failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

95.    As alleged above, Plaintiff and Class members' BPO Products contained benzene.

96.    Plaintiff and Class members are further entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

97.    All conditions precedent to the prosecution of this action have occurred, and/or have been performed, excused, or otherwise waived.

## CLASS ALLEGATIONS

98.    Plaintiff individually and on behalf of all others similarly situated, brings this class action pursuant to Fed. R. Civ. P. 23.

99.    Plaintiff seeks to represent a class defined as:

All persons who purchased the BPO Products in the United States for personal or household use within any applicable limitations period ("Nationwide Class").

100.    Plaintiff also seeks to represent a subclass defined as:

**CLASS ACTION COMPLAINT**

All persons who purchased the BPO Products in California for personal or household use within any applicable limitations period ("California Subclass").

101.    Plaintiff also seeks to represent a subclass defined as:

All persons who purchased one or more of Defendants' BPO Products in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington for personal or household use within any applicable limitations period ("Consumer Fraud Multi-State Subclass").[56]

102.    Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entities in which Defendants or their parents and any entities in which Defendants have a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the BPO Products.

103.    Plaintiff reserves the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

104.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains hundreds of thousands of members based on publicly available data. The Class is ascertainable by records in Defendants' possession.

105.    *Commonality*: Questions of law or fact common to the Class include, without limitation:

    a.    Whether the BPO Products contain benzene;

    b.    Whether a reasonable consumer would consider the presence of benzene in the BPO Products to be material;

---

[56] While discovery may alter the following, the states in the Consumer Fraud Multi-State Subclass are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

**CLASS ACTION COMPLAINT**

c.   Whether Defendants knew or should have known that the BPO Products contains benzene;

d.   Whether Defendants misrepresented the BPO Products contain or will degrade into benzene;

e.   Whether Defendants failed to disclose that the BPO Products contain or will degrade into benzene;

f.   Whether Defendants concealed that the BPO Products contain or will degrade into benzene;

g.   Whether Defendants engaged in unfair or deceptive trade practices;

h.   Whether Defendants violated the state consumer protection statutes alleged herein;

i.   Whether Defendants were unjustly enriched; and

j.   Whether Plaintiff and Class members are entitled to damages.

106.   *Typicality*: Plaintiff's claims are typical of the claims of Class members. Plaintiff and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendants relating to the same course of conduct, and are entitled to relief under the same legal theories.

107.   *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

108.   *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits

**CLASS ACTION COMPLAINT**

burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

109.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## VIOLATION OF STATE CONSUMER FRAUD ACTS

## (On behalf of Plaintiff and the Consumer Fraud Multi-State Subclass)

110.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 109 above as if fully set forth herein.

111.    Plaintiff brings this Count on behalf of himself and the Consumer Fraud Multi-State Subclass against Defendant.

112.    The Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

113.    Plaintiff and the other Members of the Consumer Fraud Multi-State Subclass have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiff and Members of the Consumer Fraud Multi-State Subclass have suffered an injury in fact and lost money as a result of Defendants' actions set forth herein.

114.    Defendants engaged in unfair and/or deceptive conduct by making material misrepresentations and omissions regarding the presence of benzene in the BPO Products, as discussed herein.

115.     Defendants intended that Plaintiff and each of the other Members of the Consumer Fraud Multi-State Subclass would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

116.     Given Defendants' position in the acne treatment market as an industry leader, Plaintiff and reasonable consumers trusted and relied on Defendants' representations and omissions regarding the presence of benzene in the BPO Products.

117.     As a result of Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other Members of the Consumer Fraud Multi-State Subclass have sustained damages in an amount to be proven at trial.

118.     In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

### SECOND CAUSE OF ACTION

### UNJUST ENRICHMENT/QUASI-CONTRACT

### (On behalf of Plaintiff and the Nationwide Class)

119.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 109 above as if fully set forth herein.

120.     Plaintiff brings this cause of action on behalf of himself and the Nationwide Class against Defendants.

121.     This claim is brought under the laws of the state of California.

122.     Defendants' conduct violated, inter alia, state and federal law by manufacturing, advertising, marketing, and selling the BPO Products while misrepresenting and omitting material facts.

123.     Defendants' unlawful conduct allowed Defendants to knowingly realize substantial revenues from selling the BPO Products at the expense of, and to the detriment or impoverishment of Plaintiff and Class members and to Defendants' benefit and enrichment. Defendants have thereby violated fundamental principles of justice, equity, and good conscience.

124.     Plaintiff and Class members conferred significant financial benefits and paid substantial compensation to Defendants for the BPO Products, which were not as Defendants

**CLASS ACTION COMPLAINT**

represented them to be.

125.    Defendants knowingly received and enjoyed the benefits conferred on them by Plaintiff and Class members.

126.    It is inequitable for Defendants to retain the benefits conferred by Plaintiff and Class members' overpayments.

127.    Plaintiff and Class members seek establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

## **THIRD CAUSE OF ACTION**

## **VIOLATION OF BUSINESS & PROFESSIONS CODE §17200, *et seq.***

## **(On behalf of Plaintiff and the California Subclass)**

128.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 109 above as if fully set forth herein.

129.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

130.    In the advertising of the BPO Products, Defendants make false and misleading statements and material omissions.  Specifically, as set forth above, representing in its labels that the BPO Products contain only the ingredients listed in the label, which is untrue, and failing to make any mention that the BPO Products are adulterated with benzene, a known human carcinogen.

131.    Defendants are aware that the claims that it makes about the BPO Products are false, misleading and unsubstantiated.

132.    Defendants' conduct is substantially injurious to consumers. Consumers are purchasing the BPO Products at premium name brand prices and using Defendants' BPO Products without knowledge that the BPO Products are contaminated with a human carcinogen. This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid for BPO Products contaminated with benzene but for Defendants' false labeling, advertising, and promotion.

**CLASS ACTION COMPLAINT**

133.    As alleged in the preceding paragraphs, the misrepresentations and omissions by Defendants of the material facts detailed above constitute an unfair and fraudulent business practice within the meaning of California Business & Professions Code § 17200.

134.    Indeed, no benefit to consumers or competition results from Defendants' conduct. Since consumers reasonably rely on Defendants' labeling of the ingredients and other information disclosing what is contained in the BPO Products and injury resulting from ordinary use, consumers could not have reasonably avoided such injury.

135.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

136.    Further, Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily. Plaintiff is a long-time user of Defendants' BPO Products, and he desires to purchase Defendants' BPO Products in the future if he can be assured that the BPO Products are unadulterated and meet the advertising claims. Absent injunctive relief, Defendants may continue to advertise, promote, and sell adulterated BPO Products that deceive the public regarding their ingredients, contents and/or safety. Plaintiff is thus likely to be wronged again in a similar way. For example, if Plaintiff or the California Subclass members encounter Defendants' BPO Products in the future and there is a risk those products still contain benzene, Plaintiff or California Subclass members may mistakenly rely on the BPO Products' labels to believe that Defendants' eliminated benzene when they did not.

137.    Pursuant to Business & Professions Code §§ 17203 and 17535, Plaintiff and the members of the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of false advertising with respect to the sale and use of the BPO Products.

138.    On behalf of Plaintiff and the California Subclass, Plaintiff also seeks an order entitling her and the Class to recover all monies spent on Defendants' BPO Products, which were acquired through acts of fraudulent, unfair, or unlawful competition.

139.    In addition, the measure of restitution should be a full refund of the purchase price,

**CLASS ACTION COMPLAINT**

1  since the BPO Products are worthless. But for Defendants' misrepresentations and omissions,

2  Plaintiff and Class members would have paid nothing for BPO Products containing benzene.

3  Indeed, there is no discernible "market" for an acne treatment product that is adulterated with a

4  known human carcinogen. As a result, Defendants' BPO Products are rendered valueless.

5  <center>**FOURTH CAUSE OF ACTION**</center>

6  <center>**VIOLATION OF BUSINESS & PROFESSIONS CODE §17500, _et seq._**</center>

7  <center>**(On behalf of Plaintiff and the California Subclass)**</center>

8  140.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

9  through 109 above as if fully set forth herein.

10  141.    California Business & Professions Code § 17500 prohibits the dissemination of

11  any advertisement which is untrue or misleading, and which is known, or which by exercise of

12  reasonable care should be known, to by untrue or misleading.  Cal. Bus. & Prof. Code §17500.

13  142.    In the advertising of the Product, Defendants make false and misleading statements

14  and material omissions.  Specifically, as set forth above, representing in its labels that its BPO

15  Products contain only the ingredients listed in the label, which is untrue, and failing to make any

16  mention that the BPO Products are adulterated with benzene, a known human carcinogen.

17  143.    Defendants are aware that the claims that it makes about the BPO Products are

18  false, misleading and unsubstantiated.

19  144.    Defendants' conduct is substantially injurious to consumers. Consumers are

20  purchasing the BPO Products at premium name brand prices and using Defendants' BPO Products

21  without knowledge that the BPO Products are contaminated with a human carcinogen. This

22  conduct has caused, and continues to cause, substantial injury to consumers because consumers

23  would not have paid for BPO Products contaminated with benzene but for Defendants' false

24  labeling, advertising, and promotion.

25  145.    As alleged in the preceding paragraphs, the misrepresentations and omissions by

26  Defendants of the material facts detailed above constitute an unfair and fraudulent business

27  practice within the meaning of California Business & Professions Code § 17500.

28  146.    Indeed, no benefit to consumers or competition results from Defendants' conduct.

<center>**CLASS ACTION COMPLAINT**</center>

Since consumers reasonably rely on Defendants' labeling of the ingredients and other information disclosing what is contained in the BPO Products and injury resulting from ordinary use, consumers could not have reasonably avoided such injury.

147.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

148.    Further, Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily. Plaintiff is a long-time user of Defendants' BPO Products, and he desires to purchase Defendants' BPO Products in the future if he can be assured that the BPO Products are unadulterated and meet the advertising claims. Absent injunctive relief, Defendants may continue to advertise, promote, and sell adulterated BPO Products that deceive the public regarding their ingredients, contents and/or safety. Plaintiff is thus likely to be wronged again in a similar way. For example, if Plaintiff or the California Subclass members encounter Defendants' BPO Products in the future and there is a risk those products still contain benzene, Plaintiff or California Subclass members may mistakenly rely on the BPO Product's label to believe that Defendants' eliminated benzene when they did not.

149.    Pursuant to Business & Professions Code §§ 17203 and 17535, Plaintiff and the members of the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of false advertising with respect to the sale and use of the BPO Products.

150.    On behalf of Plaintiff and the California Subclass, Plaintiff also seeks an order entitling her and the Class to recover all monies spent on Defendants' BPO Products, which were acquired through acts of fraudulent, unfair, or unlawful competition.

151.    In addition, the measure of restitution should be a full refund of the purchase price, since the BPO Products are worthless. But for Defendants' misrepresentations and omissions, Plaintiff and Class members would have paid nothing for BPO Products containing benzene. Indeed, there is no discernible "market" for an acne treatment product that is adulterated with a known human carcinogen. As a result, Defendants' BPO Products are rendered valueless.

**CLASS ACTION COMPLAINT**

## FIFTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA CIVIL CODE §1750, *et seq.*

## (On behalf of Plaintiff and the California Subclass)

152.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 109 above as if fully set forth herein.

153.     Plaintiff, as well as each member of the California Subclass, constitutes a "consumer" within the meaning of Civil Code §1761(d).

154.     Defendants' sales of the BPO Products constitute "transactions" within the meaning of Civil Code §1761(e).

155.     The BPO Products purchased by Plaintiff and the California Subclass constitute "goods" under Civil Code §1761(a).

156.     The California Subclass consists of thousands of persons, the joinder of whom is impracticable.

157.     There are questions of law and fact common to the classes, which questions are substantially similar and predominate over questions affecting the individual members, including but not limited to:

158.     Whether Defendant represented that the Products have characteristics, benefits, uses or quantities which they do not have;

159.     Whether the existence, extent and significance of the major misrepresentations, concealments and omissions regarding the purported benefits, characteristics and efficacy of the Products violate the Consumer Legal Remedies Act (CLRA); and

160.     Whether Defendant knew of the existence of these misrepresentations, concealments and omissions.

161.     The policies, acts, and practices heretofore described were intended to result in the sale of the Products to the consuming public and violated and continue to violate: (1) Section 1770(a)(5) of the Act which prohibits,  inter alia, "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;" (2) Section 1770(a)(7) of the Act, which prohibits, "[r]epresenting that goods or services

**CLASS ACTION COMPLAINT**

1  are of a particular standard, quality, grade, or that goods are of a particular style or model , if they

2  are of another;" (3) Section 1770(a)(9), which prohibits, '[a]dvertising goods or services with

3  intent not to sell them as advertised" and section 1770(a)(14) which bars Defendants from

4  "representing that a transaction confers or involves rights, remedies, or obligations which it does

5  not have or involve."

6      162.    Defendants fraudulently deceived Plaintiff and the California Subclass by

7  representing that the BPO Products have certain characteristics, benefits, uses and qualities which

8  they do not have.  In doing so, Defendants intentionally misrepresented and concealed material

9  facts from Plaintiff and the California Subclass, specifically and not limited to the fact that the

10  BPO Products contain only the ingredients listed in the label, which is untrue, and failing to make

11  any mention that the BPO Products are adulterated with benzene, a known human carcinogen.

12  Said misrepresentations and concealment were done with the intention of deceiving Plaintiff and

13  the California Subclass and depriving them of their legal rights and money.

14      163.    Defendants' actions as described hereinabove were done with conscious disregard

15  of Plaintiff's rights and Defendants were wanton and malicious in their concealment of the same.

16      164.    Plaintiff is a long-time user of Defendants' BPO Products, and he desires to

17  purchase Defendants' BPO Products in the future if he can be assured that the BPO Products are

18  unadulterated and meet the advertising claims. Absent injunctive relief, Defendants may continue

19  to advertise, promote, and sell adulterated BPO Products that deceive the public regarding their

20  ingredients, contents and/or safety. Plaintiff is thus likely to be wronged again in a similar way.

21  For example, if Plaintiff or the California Subclass members encounter Defendants' BPO

22  Products in the future and there is a risk those products still contain benzene, Plaintiff or California

23  Subclass members may mistakenly rely on the BPO Product's label to believe that Defendants'

24  eliminated benzene when they did not.

25      165.    Pursuant to California Civil Code §1780(a) of the Act, Plaintiff seeks injunctive

26  relief in the form of an order enjoining the above-described wrongful acts and practices of

27  Defendants including, but not limited to, an order enjoining Defendants from distributing such

28  false advertising and misrepresentations.  Plaintiff shall be irreparably harmed if such an order is

-30-
**CLASS ACTION COMPLAINT**

1    not granted.

2        166.    Plaintiff reserves the right to amend this complaint to include a request for

3    damages under the CLRA after complying with California Civil Code §1782(a) within thirty days

4    after the commencement of this action.

5                              **PRAYER FOR RELIEF**

6        WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays

7    for relief and judgment against Defendants as follows:

8        a.   Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure,

9             appointing Plaintiff as representatives of the Class and Subclasses, and designating

10            Plaintiff's counsel as Class Counsel;

11       b.   Awarding Plaintiff and Class members compensatory damages, in an amount to

12            be determined at trial;

13

14       c.   Awarding Plaintiff and Class members appropriate relief, including but not limited

15            to actual damages;

16       d.   For restitution and disgorgement of profits;

17       e.   Awarding Plaintiff and Class members reasonable attorneys' fees and costs as

18            allowable by law;

19

20       f.   Awarding pre-judgment and post-judgment interest;

21       g.   For punitive damages; and

22       h.   Granting any other relief as this Court may deem just and proper.

23    DATED:  March 28, 2024                **BRADLEY/GROMBACHER, LLP**

24

25                                   By:  /s/ Kiley L. Grombacher
                                         _____
26                                       Marcus Bradley, Esq.
                                         Kiley Grombacher, Esq.
27                                       Lisa Johnston Nicholes, Esq.
                                         *Attorneys for Plaintiff and the Putative*
28                                       *Classes*

**CLASS ACTION COMPLAINT**

1

## JURY TRIAL DEMANDED

2          Plaintiff hereby demands a trial by jury of all claims so triable.

3

4

5   DATED:  March 28, 2024                **BRADLEY/GROMBACHER, LLP**

6

7                                         By:  ___/s/ Kiley L. Grombacher___

8                                              Marcus Bradley, Esq.
                                               Kiley Grombacher, Esq.
9                                              Lisa Johnston Nicholes, Esq.
                                               *Attorneys for Plaintiff and the Putative*
10                                             *Classes*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**